# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| RUBEN GUZMAN, | ) |
| | ) |
| Plaintiff, | ) Case No. 04 C 1814 |
| | ) |
| v. | ) Magistrate Judge |
| | ) Martin C. Ashman |
| MICHAEL F. SHEAHAN, | ) |
| Sheriff of Cook County; et al., | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Defendants, Sheriff of Cook County Michael F. Sheahan, Supt. Daniel Brown, Lt. Michael Maeweather, Officer Sandra White, and County of Cook, a municipal corporation, move this Court, pursuant to Rule 56 of the Federal Rules of Civil Procedure, to enter summary disposition of Plaintiff Ruben Guzman's 42 U.S.C. § 1983 ("Section 1983") claims in their favor.[1] The parties have consented to have this Court conduct any and all proceedings in this case, including the entry of final judgment. *See* 28 U.S.C. § 636(c); Local R. 73.1(a). Venue is proper in the United States District Court for the Northern District of Illinois, Eastern Division, pursuant to 28 U.S.C. § 1391, as all parities are residents of this District and the acts complained of occurred in this District and Division. For the reasons that follow, Defendants' motion is granted.

---

[1] Plaintiff's complaints against Warden Ernesto Velasco, Sgt. Emil Hicks, Officer Patricia Watkins, Officer Lillian Wardlow, Officer Otelia Smith, and Officer Estella Lee were dismissed with prejudice by joint stipulation of the parties on February 2, 2006. (Dkt. No. 48.)

# I. Background[2]

## A. The January 21, 2003 Incident

At all times relevant to this action, Plaintiff was incarcerated as a pre-trial inmate at Cook County Jail. (Defs.' L.R. 56.1 ¶ 7.) Plaintiff entered Cook County Jail on January 13, 2003, and was assigned to Division 5, a medium security facility that held approximately eighty inmates. (Pl.'s Resp. Defs.' L.R. 56.1 ¶ 8.) Typically, inmates are awakened each day for breakfast between 3:30 a.m. and 4:30 a.m. (Id. ¶ 9.) On January 21, 2003, Plaintiff had finished eating breakfast and was sitting at a table talking with other inmates. (Defs.' L.R. 56.1 ¶ 10.) Plaintiff said that "a guy named Marcus was passing papers out and [Plaintiff] asked him what the papers were about." (Id. ¶ 11.) Fellow inmate Willis Reese told Plaintiff that it was none of his business, (id. ¶ 12), and then started hitting Plaintiff with his fist for no reason. (Id.) Reese threw a lot of punches at Plaintiff, hitting Plaintiff in the left side of his face. (Id. ¶ 14.) Plaintiff, in turn, threw at least one punch at Reese. (Id.)

After the initial exchange of punches, Reese paused for fifteen to twenty seconds to catch his breath and then started hitting Plaintiff again. (Id. ¶ 18.) Both men moved around the day room as they fought. (Id.) Plaintiff saw additional guards coming through the doors and started walking back to the table. (Id. ¶ 19.) After Plaintiff turned around, Reese hit him on the left side of his face with the brush end of a broom. (Id.) Although he was not wearing a watch at the time, Plaintiff estimated that about five minutes elapsed from the time he was first punched by Reese until the time Reese hit him with the broom. (Pl.'s Resp. Defs.' L.R. 56.1 ¶ 18.) Once

---

[2] The following facts are undisputed and are taken from Plaintiff's and Defendants' Local Rule 56.1(a) & (b) statements of uncontested material facts and accompanying exhibits.

additional officers arrived and took control of the situation, Plaintiff, who was injured and bleeding, was taken to Cermak and County Hospital. (Defs.' L.R. 56.1 ¶ 20.) As a result of the January 21, 2003 attack, Plaintiff suffered severe and lasting damage to his eye and vision.

Officer Sandra White was the correctional guard and tier officer assigned to Division 5, Tier 2K on January 21, 2003, and she was working alone at the time of the fight. (Id. ¶¶ 17, 29.) The fight started approximately thirty to forty feet away from Officer White, (Pl.'s L.R. 56.1 ¶ 8), and she estimated that it lasted between thirty seconds and one minute. (Defs.' L.R. 56.1 ¶ 40.) In the event of a fight between inmates, Officer White was trained to call for a "10-10 inmates fighting" and wait for back-up, (id. ¶ 41), and exercise her authority by giving a verbal command such as "Knock it off" or "Stop." (Pl.'s L.R. 56.1 ¶ 3.) In this case, Officer White immediately called for assistance when the fight started. (Defs.' L.R. 56.1 ¶ 17.) In fact, as soon as Reese hit Plaintiff the first time, Plaintiff saw Officer White talking into her radio. (Id. ¶ 15.) Officer White estimated that additional officers arrived on the scene in under a minute. (Id. ¶ 40.)

The parties agree that there was no advance warning that Reese would attack Plaintiff on January 21, 2003. Prior to January 21, 2003, Plaintiff had never seen, talked to, argued with, or been threatened or bothered by Reese. (Id. ¶¶ 21-24.) Plaintiff never complained about Reese to any correctional guards before Reese attacked him, (id. ¶ 26), and, as far as Plaintiff knows, prior to January 21, 2003, Reese did not have a reputation and had never threatened anyone else in Division 5, Tier 2K. (Id. ¶¶ 25, 31.)

Prior to the January 21, 2003 incident, Plaintiff had never seen or spoken to Officer White, nor told Officer White that he was in fear of Reese. (Id. ¶¶ 16, 33.) Officer White had no knowledge of any previous problems or altercations between Plaintiff and Reese. (Id. ¶ 32.)

Furthermore, Sgt. Emil Hicks, Officer White's immediate supervisor on January 21, 2003, was not aware of any problems between Plaintiff, Reese, or anyone else in Division 5, Tier 2K. (Id. ¶ 43.)

### B. Operation of Cook County Jail

Despite the fact that Plaintiff and Reese had never met, all parties agree that, given the nature of the criminal charges against Plaintiff and Reese, the two men should not have been housed together in Division 5, Tier 2K on January 21, 2003. Under the Cook County Sheriffs Department Classification Operations Manual, which provides guidelines with specific instructions for classification of inmates, the Sheriff's Department of Corrections is supposed to screen and classify inmates in order to separate inmates who pose a high risk of violent, dangerous, and disruptive behavior from inmates who do not. When making these determinations, the Department of Corrections focuses primarily on the inmate's criminal record and the nature of the criminal charges against the inmate. (Pl.'s L.R. 56.1 ¶¶ 25, 33.) In the Classification Manual there is a section that defines serious violence threat as: "Inmate has a documented history of violent conduct such as murder, rape, assault, intimidation involving a weapon and arson." (Id. ¶ 32.)

In addition to screening, classifying, and separating inmates when they first arrive at Cook County Jail, under General Order 13.6, every sixty days Department of Corrections officials are required to review every inmate for reclassification. (Id. ¶ 30.) While an inmate's classification is supposed to be reviewed every sixty days, an inmate should be immediately assessed and considered for reclassification if he receives new or upgraded charges, such as

murder, or if his bond is changed, or for disciplinary reasons. (Id. ¶ 33.) In such cases, the Sheriff's Department of Corrections should conduct a reclassification assessment when the inmate returns from court with new mittimus information ("Mitt") with a charge upgraded. (Id. ¶ 38.) Furthermore, the information from the new "Mitt" must be placed in the Record Department's CIMIS computer system. (Id. ¶ 40.) Where charges against an inmate are expanded to include murder, the new murder charge is keyed into the CIMIS computer system and should appear on the first line of the inmate's record whenever it is checked. (Id. ¶ 49.)

According to Department of Corrections classification and reclassification policies, Reese should not have been housed in a medium security facility, such as Division 5, Tier 2K, on January 21, 2003. When Reese was first classified under an armed robbery charge on July 12, 2002, his Criminal History Report showed four felony arrests, including armed robbery with a firearm, residential burglary, aggravated battery with a gun or knife, other dangerous batteries to cause bodily harm, and three misdemeanor arrests, but no convictions. (Id. ¶ 31.) At a July 18, 2002 court appearance, the charges against Reese were expanded to include murder. (Id. ¶ 41.) When the July 18, 2002 "Mitt" came back from court with the new charge of murder, and at each sixty-day reclassification date thereafter, i.e., on September 12, 2002, November 12, 2002, and January 12, 2003, Reese should have been reclassified and transferred to maximum security. (Id. ¶ 42.) Furthermore, Reese should have been reclassified each time a "Mitt" came back from a court appearance on the murder charge, such as on August 5, 2002, (id. ¶ 43), and when his bond was changed from $50,000.00 on the armed robbery charge to "No Bail" on the murder charge. (Id. ¶ 44.) Despite these many flags, Reese remained in Division 5, Tier 2K.

While Department of Corrections reclassification personnel, including Lt. Maeweather and Supt. Brown, have no explanation for why Reese was not reclassified to maximum security prior to January 21, 2003, (id. ¶ 53), the failure to properly reclassify Reese was not an isolated incident. The Department of Corrections classification unit processes approximately 350 to 400 inmates a day, 2,000 inmates a week, 8,000 inmates a month, and 100,000 inmates a year. (Def.'s L.R. 56.1 ¶ 46.) Typically, there are about 15,000 inmates in the Jail at any given time. (Pl.'s L.R. 56.1 ¶ 52.) The classification unit processes as many inmate reclassifications as they can each day but, due to the large number of inmates and the small number of reclassification personnel, the classification unit does not always succeed in getting through the daily reclassification list. (Id.) Furthermore, because there is a new reclassification list generated every day, when an inmate is not processed one day he will not be reviewed for reclassification the next day. Rather, unless there is a new charge against the inmate, a change in bond, or a discipline issue, the inmate will not automatically appear on the reclassification list for another sixty days. (Id.) Though the record does not shed light on the average number of inmates who appear on the daily reclassification list but are not processed, the evidence suggests that the classification unit fails to get through the daily reclassification list on a regular basis.

## II. Discussion

In February 2004, Plaintiff filed suit against Defendants in Circuit Court of Cook County claiming that Defendants failed to properly respond to Reese's attack on Plaintiff, and that Defendants have an official policy of housing high-risk, dangerous inmates with nonviolent inmates, in violation of General Order 13.6 and Illinois State law. Plaintiff's suit was removed to

the federal court in the Northern District of Illinois on March 9, 2004. On June 1, 2006, Defendants filed the instant motion for summary judgment.

A.   **Defendants' Motion For Summary Judgment**

Summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Sinkler v. Midwest Prop. Mgmt. Ltd.*, 209 F.3d 678, 683 (7th Cir. 2000). In determining whether summary judgment is appropriate, the Court must view the evidence, and draw all reasonable inferences therefrom, in the light most favorable to the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Kennedy v. United States*, 965 F.2d 413, 417 (7th Cir. 1992). However, if the non-movant bears the burden of proof on an issue he may not simply rest on the pleadings, but rather must affirmatively set forth specific facts establishing the existence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 322-26.

Summary judgment is appropriate when the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. If taking the record in its entirety cannot lead a rational trier of fact to find for the non-moving party, then there is no genuine issue for trial and summary judgment must be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### 1. Count I

In Count I, Plaintiff claims that, after Reese's initial assault upon Plaintiff, Officer White knew that Reese posed an imminent threat of causing great bodily harm to Plaintiff. (Pl.'s Second Am. Compl. at 3.) Plaintiff alleges that, by failing to interrupt or restrain Reese from attacking Plaintiff a second time, Officer White was consciously and deliberately indifferent to Plaintiff's safety and welfare, and thereby deprived him of rights guaranteed to him while in custody, in violation of Section 1983 and the United States Constitution. (Id. at 3-4.) Defendants argue that Officer White did not know that Reese posed a threat to Plaintiff and, in any event, Officer White's response to Reese's assault upon Plaintiff was adequate and reasonable. (Def.'s Br. at 5.)

Prison officials have a duty to protect prisoners from violence at the hands of other prisoners. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). Under Section 1983, prison officials who deprive an inmate of his rights under the Constitution shall be liable to the injured inmate in an action at law. 42 U.S.C. § 1983. Plaintiff was a pre-trial inmate on January 21, 2003, and had not yet been convicted of a crime, so his Section 1983 claim is analyzed under the Fourteenth Amendment's Due Process Clause rather than under the Eighth Amendment's Cruel and Unusual Punishment Clause. *Butera v. Cottey*, 285 F.3d 601, 605 (7th Cir. 2002). Under the Fourteenth Amendment analysis, Plaintiff is protected from Officer White's deliberate indifference to his safety. *Id.* A finding of deliberate indifference requires a showing that Officer White was aware of a substantial risk of serious injury to Plaintiff but nevertheless failed to take appropriate steps to protect him from a known danger. *Id.* To be deliberately indifferent, Officer White must have acted with the equivalent of criminal recklessness. *Fisher v. Lovejoy*, 414 F.3d 659, 662 (7th Cir.

2005). Indeed, even if Officer White actually knew of a substantial risk to Plaintiff's safety, Officer White is free from liability if she responded reasonably to the risk, even if the harm ultimately was not averted. *Id.* The existence or possibility of other better responses or policies which might have been used to protect Plaintiff does not necessarily mean that Officer White was being deliberately indifferent. *Id.*; *Frake v. City of Chicago*, 210 F.3d 779, 781 (7th Cir. 2000).

All parties agree that, prior to Reese's initial assault upon Plaintiff, Officer White was not aware of a substantial risk of serious injury to Plaintiff. Plaintiff admits that he never had any concerns about Reese, never complained to Officer White or any other corrections officer about Reese, and that Reese's initial assault upon him was completely spontaneous and unexpected. (Pl.'s Br. at 3.) Plaintiff argues, however, that Officer White became aware of a substantial risk of serious injury to Plaintiff when she witnessed Reese's initial assault upon Plaintiff and concludes that Officer White had a responsibility to protect him from the second attack, which occurred moments later.

The parties disagree as to how many minutes passed between the two attacks so the Court will rely on Plaintiff's description of the events in question. In his deposition, Plaintiff stated that Reese attacked him, punching him ten or fifteen times, then rested for fifteen or twenty seconds in order to catch his breath, and then continued punching. (Defs.' L.R. 56.1 ¶ 18; Pl.'s L.R. 56.1, Ex. B., pp. 34-39.) Soon after Reese relaunched his attack, corrections officers entered the day room to break up the fight. Once he saw the officers enter the day room, Plaintiff turned his back on Reese and went to sit down, at which point Reese struck Plaintiff in the face with a broom. Plaintiff estimated that between four and six minutes passed from the time that Reese punched him until the time that Reese hit him with a broom, (Pl.'s Resp. Defs.' L.R. 56.1 ¶ 18), but

Plaintiff admitted that he did not have access to a watch or clock at the time and his estimate was just "a guess." (Defs.' L.R. 56.1 ¶ 39; Pl.'s L.R. 56.1, Ex. B, p. 40.)

Plaintiff does not describe two separate attacks. While it is clear that Reese did not assault Plaintiff continuously for the entire four to six minutes in question, the temporal separation of the "two" attacks is negligible, barely providing Officer White an opportunity to respond to the events as they occurred, let alone be put on notice of a high risk of future dangers. Because Officer White had no reason to suspect the January 21, 2003 attack would occur, she could not know of a substantial risk of serious injury to Plaintiff, nor take appropriate steps to protect him from a known danger.

Even if Officer White had actual knowledge of a substantial risk to Plaintiff, Officer White is not liable for Plaintiff's injuries because she responded reasonably to the risk. Officer White was trained to respond to fights between inmates by calling for back-up and by asserting her authority through verbal commands. Plaintiff admits that Officer White called for back-up moments after Reese began his assault but argues that Officer White could have prevented his injuries if she had asserted her authority through verbal commands. Specifically, Plaintiff contends that Officer White could have shouted at Reese through a screen window, thereby audibly asserting her authority without actually entering the day room and putting herself at risk.[3] Plaintiff claims that Officer White not only failed to yell at Reese but was derelict in her duties because she abandoned her post for several minutes after the fighting began, (Pl.'s L.R. 56.1 ¶ 11); a claim that Officer White vehemently denies. Assuming Plaintiff's deposition testimony

---

[3] Plaintiff acknowledges that corrections officers—especially female officers—are trained not to enter the day room when they are alone on duty, as such action may increase the risk of violence and injury to both inmates and guards. (Defs.' L.R. 56.1 ¶ 42.)

is true, and Officer White failed to either assert her authority or remain at her post, the evidence nonetheless establishes that Officer White responded reasonably, if not perfectly, to the January 21, 2003 attack. It follows that Officer White is not liable for Plaintiff's injuries. *See Farmer*, 511 U.S. at 844; *Butera*, 285 F.3d 605.

Plaintiff relies on *Peate v. McCann*, 294 F.3d 879 (7th Cir. 2002), and argues that Officer White's failure to intervene to prevent Reese's second attack constituted deliberate indifference. In *Peate*, a prison inmate named McIntyre unexpectedly attacked a second inmate named Peate with a laundry bag filled with rocks and concrete. *Id.* at 881. The corrections officer at the scene, Officer McCann, immediately called for back-up. After several minutes of fighting, additional officers arrived at the scene and succeeded in separating the two inmates and confiscating the laundry-bag weapon. *Id.* A few minutes later, a second fight erupted between the inmates when McIntyre again attacked Peate with the laundry-bag weapon. *Id.* Several witnesses stated that McIntyre regained control of the laundry-bag weapon when Officer McCann handed it to him after the two engaged in a short discussion. *Id.* at 883. Based on these facts, the Seventh Circuit found that the district court erred in granting Officer McCann's motion for summary judgment because a jury could conclude that (1) the original fight provided Officer McCann with actual knowledge of a significant threat to Peate, and (2) Officer McCann displayed deliberate indifference to Peate's safety when he re-armed McIntyre with the laundry-bag weapon. *Id.*

*Peate* is fundamentally different from the case at bar. First, *Peate* deals with two distinct fights separated by several minutes during which correctional officers took control of the situation and physically separated the fighting inmates. As stated above, in this case there was no

meaningful pause in the fighting between Plaintiff and Reese and Officer White never succeeded in separating the two inmates or gaining control of the situation. It follows that, unlike Officer McCann, Officer White never had any advance knowledge of a risk to Plaintiff's safety, nor any opportunity to protect Plaintiff. Second, in *Peate*, evidence suggested that Officer McCann re-armed McIntyre moments after McIntyre attacked Peate, while Peate was still in the immediate vicinity. Re-arming McIntyre under those circumstances was a dangerous act that substantially and unnecessarily increased Peate's risk of injury. Unlike McCann's decision to re-inflame and intensify an already dangerous situation, Officer White decided to implement her training to end the fighting by calling for back up. While Plaintiff alleges that Officer White could have done more to protect him, there is no evidence that Officer White ignored, let alone took steps that increased, Plaintiff's risk of injury. Given the significant differences between this case and *Peate*, *Peate* does not affect this Court's ruling.

For the reasons stated above, Defendants' motion for summary judgment on Plaintiff's Count I against Officer White is granted.

### 2. Count II

In Count II, Plaintiff alleges that Defendants Sheriff Sheahan, Supt. Brown, and Lt. Maeweather, in their official capacities with the Sheriff's Office and the Cook County Department of Corrections, implemented and enforced policies and procedures that created known and obvious risks of physical harm and injury to inmates in the Cook County Jail, and to Plaintiff in particular. (Pl.'s Second Am. Compl. at 5-12.) Defendants reject this claim and argue

that their policy and practice is to properly classify and reclassify inmates to the best of their ability for the benefit of the Jail, inmates, and guards.

Plaintiff brings official capacity claims against Defendants. Official capacity claims require Plaintiff to demonstrate that "the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences." *Boyce v. Moore*, 314 F.3d 884, 891 (7th Cir. 2002). Actions brought against government officers in their official capacities are actually claims against the government entity for which the officers work. *Kentucky v. Graham*, 473 U.S. 159, 166-68 (1985). Governmental employees cannot be held liable in their official capacities in a Section 1983 action unless Plaintiff can show that he suffered injuries of a constitutional magnitude as a result of an official custom, policy or practice. *Monell v. Dept. of Social Servs. of City of New York*, 436 U.S. 658, 690 (1977). Municipalities cannot be held liable for Section 1983 claims under a theory of *respondeat superior*. *Id.* at 691; *Garrison v. Burke*, 165 F.3d 565, 571 (7th Cir. 1999).

Courts have identified three instances in which a municipality can be said to violate a person's rights because of its policy: (1) an express policy that, when enforced, causes a constitutional deprivation, (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law, or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority. *Baxter by Baxter v. Vigo County Sch. Corp.*, 26 F.3d 728, 735 (7th Cir. 1994). Most importantly, a plaintiff must show that deliberate action attributable to the municipality directly caused a deprivation of federal rights. *Frake*, 210 F.3d at 781. In other words, a plaintiff must show that the injury was caused by the policy. *Id.* A single allegation of

wrongdoing on the part of the defendant is insufficient to establish a policy, custom or practice. *Sivard v. Pulaski County*, 17 F.3d 185, 188 (7th Cir. 1994).

As described above, General Order 13.6 requires the Department of Corrections to reassess inmates every sixty days to determine if they are being housed appropriately. If an inmate is charged with a new crime or his bond is changed, a custody reassessment is supposed to occur immediately. The primary function of custody reassessment is to monitor the inmates adjustment and bring attention to problems that may arise. (Pl.'s L.R. 56.1, Ex. N.) In this way, the custody reassessment policy helps the Sheriff's Office manage and control the inmate population and lowers the degree of violence and disruption between inmates and between guards and inmates.

Plaintiff argues that despite the official policies set out in General Order 13.6, Defendants have a policy of improperly classifying and reclassifying inmates that is so permanent and well settled as to constitute a custom or usage with the force of law. Specifically, Plaintiff claims that Defendants ignore General Order 13.6 and their obligation to properly classify and reclassify inmates and instead knowingly and consciously implement a policy of housing dangerous, high risk inmates with low and medium risk inmates, in violation of the Fourteenth Amendment. Plaintiff's evidence of Defendants' allegedly unconstitutional policy includes (1) admissions that inmates charged with murder are potentially dangerous and should not be housed in medium and low security tiers, (2) Lt. Maeweather's admission that it is impossible for the classification unit to process the entire reclassification list of inmates every day, and (3) corrections officers' admissions that, due to overcrowding, it is not uncommon to have inmates with dissimilar criminal histories housed together. (Id. ¶¶ 22-25, 52.) Based on this evidence, Plaintiff

concludes that the Defendants' failure to reclassify Reese when he was charged with murder, when his bond was changed, when he was moved out of protective custody, and every sixty days after the change in charges and bond, is not merely an isolated incident where a dangerous inmate slipped between the cracks, but rather the direct and foreseeable result of Defendants' policy of indifference to substantial risks to Plaintiff and other inmates.

Plaintiff's evidence does not establish an official policy of indifference to substantial risk. Based on the stated aims of the custody reassessment policy and the criteria used for reclassifying inmates, it is clear that the Department of Corrections recognizes that inmates with violent criminal histories pose significant risks to less violent inmates and should not be housed in medium and low security tiers. Rather than ignore this risk, however, the Sheriff's Department of Corrections takes active steps to reduce it. In their deposition testimony, Lt. Maeweather and others stated that the classification unit is charged with reassessing the entire reclassification list and making any necessary changes every day. (Id. ¶ 52.) Lt. Maeweather testified that the classification unit does the best it can to get through the entire list every day but he acknowledged that, due to the small staff and the large number of inmates on the reclassification list, doing the best it can does not always mean getting through the entire list. (Id.) Lt. Maeweather did not say that his unit never completes the daily list, nor did he say that getting through the list is not a priority for his unit. Rather, Lt. Maeweather reported that there are some logistical flaws in the Sheriff's policy. This is quite different from "knowingly ignor[ing] requirements to reclassify violent inmates to Maximum security . . ." and "admit[ting] actual knowledge that [the reclassification policy] was not being accomplished." (Pl.'s Br. at 9.)

Plaintiff suggests that, under Illinois State regulations and General Order 13.6, custody reclassification is mandatory and Defendants are liable per se for the Department of Corrections's regular failure to comply fully with the regulations. The Court disagrees and finds that Plaintiff holds the Sheriff's Department of Corrections to too high a standard. For liability to attach against a municipality under Section 1983, Plaintiff must show that deliberate action attributable to the Sheriff's Department of Corrections caused a deprivation of his federal rights. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986); *Frake*, 210 F.3d at 781. Neither general allegations of administrative negligence, nor allegations of operational error, state a constitutional claim cognizable under Section 1983. *Polk County v. Dodson*, 454 U.S. 312, 326 (1981), citing *Rizzo v. Goode*, 423 U.S. 362, 370-77 (1976); *Hernandez v. Sheahan*, 455 F.3d 772, 775 (7th Cir. 2006). While there are flaws in the daily operation of the Sheriff's reclassification policy, the Sheriff's policy is not to consciously disregard obvious dangers but rather to work every day—to the best of the Department's ability—to comply with General Order 13.6 and reduce risks to inmates. The failure to reclassify Reese may not have been a one-of-a-kind incident, but that incident represents a failure, not a foreseeable result or intended consequence, of the Defendants' policy. Such shortcomings do not support municipal liability.

Plaintiff argues that Defendants must be liable under Section 1983 because the facts of this case are particularly egregious. Plaintiff compares the case at bar to *Pierson v. Hartley*, 391 F.3d 898 (7th Cir. 2004). In *Pierson*, an inmate named Wilkinson had a history of violent conduct while in prison. When Wilkinson was transferred to a new prison, officials at the new prison received a letter from officials at the old prison detailing Wilkinson's behavior and describing him as an "ESCAPE AND ASSAULT RISK." *Id.* at 901. Despite this warning,

Wilkinson was placed in a meritorious dormitory unit. *Id.* Five months later, Wilkinson was convicted in the prison disciplinary system of possessing a weapon; a conviction that would ordinarily lead to removal from the meritorious dormitory. *Id.* Despite the conviction, however, prison officials allowed Wilkinson to stay in the meritorious dormitory. *Id.* Several months later, Wilkinson brutally attacked Pierson. *Id.* The case went to trial and the jury found two prison officers liable for violating Pierson's constitutional rights under the Eighth Amendment. *Id.* The district court reversed the jury verdict and granted the officers judgement as a matter of law. *Id.* On appeal, the Seventh Circuit found sufficient evidence to demonstrate that the prison officials consciously and repeatedly disregarded the substantial risk posed by Wilkinson, and then reversed the district court and remanded the case with instructions to reinstate the jury verdict. *Id.* at 903.

*Pierson* does not help Plaintiff's case. As an initial matter, the district court in *Pierson* granted the prison superintendents summary judgment on Pierson's *Monell* claims, noting no causal connection between those defendants and the assault. *Id.* at 901. That decision was not reversed by the Seventh Circuit. Next, unlike Wilkinson, Reese had no record of violent or inappropriate behavior while in prison and was never singled out as a substantial risk to Plaintiff or any other inmates. While Reese did fit a general profile of an inmate normally assigned to maximum security, there were no blatant warning signals—such as letters warning of impending danger—that Defendants should have recognized. As stated above, Reese carried out a spontaneous, unforeseeable attack for which Defendants cannot be held liable under Section 1983.

Plaintiff fails to produce evidence of a municipal policy that violates his constitutional rights or evidence that Defendants are personally liable for his injuries. It follows that Plaintiff's Section 1983 and *Monell* claims must fail.

### 3. Count III

Count III of Plaintiff's Complaint demands judgment against County of Cook because, at all times pertinent to this action, County of Cook was a municipal corporation which was obligated to indemnify Sheriff Sheahan, Supt. Brown, Lt. Maeweather, and Officer White from any judgement and/or settlement incurred by any one or more of the Defendants, arising from this action. Because the Court grants Defendants' motion for summary judgment on Counts I and II, Plaintiff cannot prevail on Count III so the Court grants summary judgment on Count III.

### B. Defendants' Motion To Strike

Defendants also filed a motion to strike Plaintiff's Exhibit T, which is attached to Plaintiff's response to Defendants' motion for summary judgment. Exhibit T is a doctor's report that purports to describe the injuries Plaintiff suffered on January 21, 2003. Defendants argue that this medical report constitutes inadmissible hearsay because it is an out-of-court statement which Plaintiff cites to prove the truth of the matter asserted. (Def.'s Mot. Strike at 1.) Defendants contend that the medical record does not fall into any hearsay exception because it was not used for diagnosis or treatment and is not reliable. (Id.)

Plaintiff's Exhibit T was apparently attached to Plaintiff's response brief in order to establish that Plaintiff did in fact suffer permanent injuries on January 21, 2003. There was

never any dispute, however, that Plaintiff was injured in the January 21, 2003 fight, and, for the purposes of the instant motion for summary judgment, the Court assumed those injuries were severe and permanent. The severity of Plaintiff's injury, however, does not affect the Court's decision to grant Defendants' motion for summary judgment. Furthermore, having granted Defendants' motion for summary judgement, whether or not Plaintiff's Exhibit T constitutes inadmissible hearsay is a nonissue and Defendants' motion is moot. For these reasons, Defendants' motion to strike is denied.

### III. Conclusion

For the reasons set forth above, Defendants' motion for summary judgment is granted and Defendants' motion to strike is denied.

**ENTER ORDER:**

Dated: September 5, 2006.

MARTIN C. ASHMAN
United States Magistrate Judge

Copies have been mailed to:

| | |
|---|---|
| ROBERT B. PATTERSON, Esq. | PAUL W. GROAH, Esq. |
| Law Offices of Robert B. Patterson, Ltd. | Assistant State's Attorney's Office |
| 221 North LaSalle Street | Civil Actions Bureau |
| Suite 1050 | 500 Richard J. Daley Center |
| Chicago, IL 60601 | Chicago, IL 60602 |
| | |
| Attorney for Plaintiff | Atttorney for Defendant |